# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

| | |
|---|---|
| Rusty Sanders; Malik Scott; John Scott Jr.; Christopher Shelton; Martin Shorey; George Stroke; Ronald Veal; Blaine Victoriano; Derrick Washington; Landon Weaver; Carr Willis; Willie Woodard; Robert Yeary; Daniel Anderson; Timothy Ault; Steven Austin; Daniel Besson; Ricky Bias; Kevin Bihm; Todd Blanchard; Mathew Boettner; Joseph Bolton; Robert Brawley; Michael Brown; Andrew Buller; Edward Butler; Tyler Cannon; Rodrick Carter; Jason Cartwright; Joshua Chapman; Arthur Chatellier; Arthur Christman; Jonathan Clements; Steven Cojoe; Cg Conerly; Shaun Dauzat; Steven Dearman; Randon Dick; Jeremy Dixon; James Dunn III; Christopher Efferson; Damon Evans; Gary Falls; Emanuel Farciert; John Frye; Avery Graves; John Halfaker; Maurice Harvey; Ryan Hebert; Juan Hernandez; Brandon Hoyt; Lester Jenkins; Marlynda Johnson; Randy Lafleur; Dustin Ledoux; Howard Leleux; Darius Leopaul; Jonathan London; Jacob Manausa; Todd Manguno; Robert Maxwell; Michael Mayence; Rodger McConnell; Michael McMichael;Christopher Morgan; Heath Mouton; Trent Mouton; Karnelius Palmer; Justin Perkins; Samuel Perkins; Timothy Perrill; Nnanji Powell; Christopher Prosperie; Ammos Pugh; Michael Rath; Derrick Roberts; Jerome Roberts; Christopher Rodriguez; Timothy Soignet; Jeffery Stewart; Dominic Stovall; Mark Strecker Jr; Vincent Sutton; Mark Swinnen; Roderick Taylor; Tristan Taylor; Fordham Terrill; Kyle Trahan; Paul Trahan Il; John Valverde; Marvin Venious; Brandon West; Christopher Williams; Ray Williams; | Case No.: 19-cv-2083<br><br>**NOTICE OF REMOVAL** |

    Plaintiffs,

v.

3M Company and
Aearo Technologies LLC,

    Defendants.

---

  Defendant 3M Company ("3M") hereby gives notice of removal of this action, pursuant to 28 U.S.C. §§ 1441, 1442(a)(1), and 1446, to the United States District Court for the District of Minnesota. As grounds for removal, 3M states as follows:

  Plaintiffs are servicemembers who seek to hold Defendants 3M and Aearo Technologies LLC[1] liable for hearing loss they allegedly suffered while serving in various branches of the U.S. military, and including during combat. They contend that Combat Arms™ Earplugs, Version 2 ("CAEv2") manufactured and sold by Aearo were defectively designed and failed to provide adequate hearing protection. 3M denies these allegations. CAEv2, designed by Aearo in close collaboration with the U.S. military, represented a revolutionary breakthrough in hearing protection for service members. CAEv2 helped servicemembers better maintain situational awareness (e.g., to hear nearby voice commands) while also maintaining some protection from gunfire and other higher decibel

---

[1] 3M acquired Aearo Technologies, Inc. ("Aearo") in 2008. After acquiring Aearo in 2008, 3M continued to sell CAEv2. Aearo Technologies LLC, named in the Complaint, is a different entity from Aearo. Nonetheless, it consents to this removal.

sounds. CAEv2 met the U.S. military's specifications and helped the military provide hearing protection to servicemembers.

In this action, 3M intends to assert the federal government contractor defense and the combatant activities defense. Aearo sold the CAEv2 to the U.S. military under government contracts and in accordance with the military's rigorous specifications. Plaintiffs further allege they suffered damage to their hearing, at least in part, while engaged in combat. Under the federal officer removal statute, 28 U.S.C. § 1442(a)(1), 3M is entitled to remove this action to have its federal defenses adjudicated in a federal forum. Such removal "fulfills the federal officer removal statute's purpose of protecting persons who, through contractual relationships with the Government, perform jobs that the Government otherwise would have performed." *Isaacson v. Dow Chem. Co.*, 517 F.3d 129, 133 (2d Cir. 2008) (*citing Watson v. Philip Morris Cos., Inc.*, 551 U.S. 142, 127 (2007)). 3M also contends that this case and others like it present a nonjusticiable political question, as the design of the CAEv2 reflects the balance struck by the military between hearing protection and military operational needs. *See, e.g.*, *Whitaker v. Kellogg Brown & Root, Inc.*, 444 F. Supp. 2d 1277, 1281 (M.D. Ga. 2006).

Separately, this action is also removable because Plaintiffs seek to hold 3M liable for alleged injuries that occurred in part at U.S. military facilities in connection with Plaintiffs' military service. While Plaintiffs do not identify these facilities specifically in their complaint, they are almost certainly "federal enclaves" for jurisdictional purposes. "Federal courts have federal question jurisdiction over tort claims that arise on 'federal enclaves.'" *Durham v. Lockheed Martin Corp.*, 445 F.3d 1247, 1250 (9th Cir. 2006).

Because Plaintiffs' claims arose, at least in part, at federal enclaves, the claims involve a federal question, and 3M may remove this action under 28 U.S.C. § 1441(a).

Removal is timely because this action was served on 3M on July 24, 2019. Venue is proper pursuant to 28 U.S.C. §§ 112(a) and 1441(a) because the Fourth Judicial District is located within this District. Pursuant to 28 U.S.C. § 1446(d), a copy of this Notice of Removal is being served upon counsel for Plaintiffs and a copy is being filed with the Clerk of the Fourth Judicial District.

## **BACKGROUND**

The CAEv2 is an earplug with two insertable ends developed specifically for the needs of the U.S. military for use as hearing protection in noisy environments. CAEv2 has a yellow end and green end. Each end has a different purpose. When the yellow end of the earplug is inserted, users can still hear nearby low-level sounds, like verbal communication, but receive protection from high-level impulse noise, like gunfire. In contrast, when the green end of the earplug is inserted, CAEv2 acts like a traditional earplug, providing steady and continuous protection from both ambient and impulse noise.

In the area of national defense, the U.S. military relies on close collaboration with private contractors to design and develop products, such as the CAEv2, and manufacture and supply those products in accordance with highly particular specifications balancing the multitude of operational and budgetary needs of equipping the nation's fighting forces. This litigation involves a classic example of that military-contractor collaboration.

CAEv2 was designed at the request of and in consultation with military audiologists, including Dr. Doug Ohlin. Ohlin at the time served in the capacity of Program Manager,

Hearing Conservation, U.S. Army Center for Health Promotion and Preventive Medicine (USACHPPM). Ohlin and his program gave direction to Aearo to ensure that the CAEv2 would appropriately balance performance with military operational needs for servicemembers. For example, Ohlin proposed the inclusion of the filter that was a key updated feature of the CAEv2. Ohlin specifically directed Aearo to ensure that the CAEv2 would fit into a military-issued carrying case. Ohlin also was involved in Aearo's testing of the CAEv2.[2]

Following the development of the product, Ohlin was involved in the ultimate approval of CAEv2 for military use and proposed purchasing CAEv2 to the Joint Readiness Clinical Advisory Board. The military's specifications for the CAEv2 reflect the design direction that Ohlin and his program gave to Aearo. In particular, these specifications are memorialized in a Medical Procurement Item Description (MPID) that was used by the Defense Logistics Agency (the U.S. military's purchasing authority), in soliciting bids from Aearo for the CAEv2. The MPID specified "military unique, double-ended ear plugs suitable for use as hearing protectors for military personnel in chronically noisy environments," that should "be designed to provide protection from the unique noises created by military firearms, while allowing the wearer to clearly hear normal speech . . . such as voice commands, on the battlefield" and should be "camouflage green or another suitable dark color."

---

[2] Ohlin's involvement continued following the military's decision to purchase and deploy the CAEv2. He provided Aearo with feedback from military personnel as to using the CAEv2 and developed training and instructions for military personnel.

In sum, the CAEv2 was launched at the request of, and in close coordination with, the U.S. military. The CAEv2's design reflects the direction and feedback of individuals acting on behalf of the U.S. military. The U.S. military purchased the CAEv2 and issued it to servicemembers like Plaintiffs precisely because the CAEv2 fulfill the military's specifications and accomplishes the military's goal of balancing hearing protection with operational needs.

## BASES FOR FEDERAL JURISDICTION AND REMOVAL

### I. REMOVAL IS PROPER UNDER THE FEDERAL OFFICER REMOVAL STATUTE.

Removal is proper under 28 U.S.C. § 1442(a)(1), which provides for removal when a defendant is sued for acts undertaken at the direction of a federal officer. Removal rights under this section are much broader than under the general removal statute, 28 U.S.C. § 1441. Suits against defendants acting on behalf of federal officers "may be removed despite the nonfederal cast of the complaint; the federal-question element is met if the defense depends on federal law." *Jefferson County v. Acker*, 527 U.S. 423, 431 (1999). This is because Section 1442 protects "the government's need to provide a federal forum for its officers and those who are 'acting under' a federal office." *Albrecht v. A.O. Smith Water Prod.*, No. 11 Civ. 5990 (BSJ), 2011 WL 5109532, at *3 (S.D.N.Y. Oct. 21, 2011). This important federal policy "should not be frustrated by a narrow, grudging interpretation of s 1442(a)(1)." *Willingham v. Morgan*, 395 U.S. 402, 407 (1969).

The removing defendant must establish that: (1) the defendant is a "person" under the statute; (2) the defendant was "acting under" the direction of a federal officer when it

engaged in the allegedly tortious conduct; (3) the defendant was acting "under color of" federal office at the time of the allegedly tortious conduct; and (4) the defendant raises a "colorable" federal defense. *See Mesa v. California*, 489 U.S. 121, 124-25, 129-31, 134-35 (1989); *Jacks v. Meridian Res. Co., LLC*, 701 F.3d 1224, 1230 (8th Cir. 2012). All requirements for removal under § 1442(a)(1) are satisfied here. *Cf., e.g.*, *Ayo v. 3M Co.*, No. 18-CV-0373 (JS)(AYS), 2018 WL 4781145 (E.D.N.Y. Sept. 30, 2018) (denying motion to remand and finding that federal officer removal was proper in case where product liability was sought for defendants' product's conformance with military specifications).

### A. The "Person" Requirement Is Satisfied.

The first requirement for removal under Section 1442 is satisfied because 3M is a "person" under the statute. For purposes of § 1442(a)(1), the term "person" includes "'companies, associations, firms, [and] partnerships.'" *Papp v. Fore-Kast Sales Co.*, 842 F.3d 805, 812 (3d Cir. 2016) (quoting 1 U.S.C. § 1); *Isaacson*, 517 F.3d at 135-36 (holding non-natural person to be a "person" under § 1442).

### B. The "Acting Under" Requirement Is Satisfied.

To satisfy the second requirement ("acting under" a federal officer) "a private person's actions 'must involve an effort to assist, or to help carry out, the duties or tasks of the federal superior.'" *Jacks*, 701 F.3d at 1230 (holding that health insurer contracted by U.S. Office of Personnel Management was "acting under" a federal officer) (*quoting Watson*, 551 U.S. at 152). "The words 'acting under' are to be interpreted broadly." *Isaacson*, 517 F.3d at 136. Federal courts "have explicitly rejected the notion that a defendant could only be 'acting under' a federal officer if the complained-of conduct was

done at the specific behest of the federal officer or agency." *Papp*, 842 F.3d at 813; *see also Jacks*, 701 F.3d at 1230 (although "not limitless, '[t]he words "acting under" are broad,' and the Supreme Court 'has made clear that the statute must be "liberally construed."'") (*quoting Watson*, 551 U.S. at 147).

The "acting under" requirement is met here because Plaintiffs directly challenge Defendants' alleged conduct in providing vital products "that, in the absence of Defendants, the Government would have had to produce itself." *Isaacson*, 517 F.3d at 137. As discussed above, Aearo designed and manufactured the CAEv2 at the direction of the U.S. military to meet the military's specific needs to provide hearing protection.

Plaintiffs' Complaint effectively concedes that Aearo was "acting under" federal officers of the Department of Defense and its agencies when manufacturing and selling the CAEv2 they were provided. Plaintiffs allege that Aearo specifically developed the CAEv2 for the military's use and to meet the military's specifications:

- "Aearo developed dual-ended non-linear (selective attenuation) Combat Arms™ earplugs for the specific purpose of providing servicemen a single set of earplugs that provide two options for hearing attenuation depending on how they are worn[.]" (Compl. ¶ 106.)

- "Based on the supposed technological design and qualities of the Combat Arms™ earplugs, Defendants won a series of Indefinite-Quantity Contracts ('IQCs') to be the exclusive supplier of selective attenuation earplugs to the U.S. military between 2003 and 2012." (*Id.* ¶ 108.)

- "To win these IQCs, Defendants represented that the Combat Arms™ earplugs would meet specific performance criteria established by the U.S. Government as a prerequisite for bidding on the IQC for earplugs." (*Id.* ¶ 109.)

- "In addition, the U.S. military may only purchase earplugs that meet the testing standards established by the U.S. Army Public Health

8

> Command, Army Hearing Program, or equivalent standards that may be established by other branches of the military." (*Id.* ¶ 116.)

Not only did Aearo meet "specific performance criteria established by the U.S. Government," it developed the CAEv2 under the direction of, and with significant involvement of, representatives of the U.S. military. *See e.g. Ruppel v. CBS Corp.*, 701 F.3d 1176, 1181 (7th Cir. 2012) (holding that defendant was "acting under" a federal officer because it "worked hand-in-hand with the government, assisting the federal government in building warships. 'Acting under' covers situations, like this one, where the federal government uses a private corporation to achieve an end it would have otherwise used its own agents to complete."); *Isaacson*, 517 F.3d at 137 ("Defendants contracted with the Government to provide a product that the Government was using during war—a product that, in the absence of Defendants, the Government would have had to produce itself."); *In re National Prescription Opiate Litig.*, 327 F. Supp. 3d 1064, 1075-76 (N.D. Ohio 2018) (removal under § 1442 was appropriate were defendant was subject to "precise specifications" of government contract, administration of contract was overseen by federal official, and absent defendant's role, government would have had to warehouse and distribute product itself).

As described above, the military's involvement went beyond merely establishing standards. Its involvement also included such operational features as ensuring the CAEv2 would fit in military-issued containers. Such involvement is quintessential activity "acting under" a federal officer. *See e.g. Winters v. Diamond Shamrock Chemical Co.*, 149 F.3d 387 (5th Cir. 1998) (authorizing removal of a tort suit against private defense contractors

that manufactured Agent Orange); *Gordon v. Air & Liquid Sys. Corp.*, 990 F. Supp. 2d 311, 320 (E.D.N.Y. 2014) (contractor was "acting under" a federal officer for purposes of removal statute when it provided products used in construction of ships to Navy's precise specifications).

### C. The "Causation" Requirement Is Satisfied.

The third prong, that a defendant's actions were taken "under color of federal office . . . has come to be known as the causation requirement." *Isaacson*, 517 F.3d at 137 (internal quotation marks, alterations, and citation omitted). Like the "acting under" requirement, "[t]he hurdle erected by this requirement is quite low." *Id.* Courts "credit Defendants' theory of the case when determining whether [this] causal connection exists." *Isaacson*, 517 F.3d at 137 (*citing Acker*, 527 U.S. at 431-32 (1999) ("demanding an airtight case on the merits in order to show the required causal connection" would "defeat the purpose of the removal statute").[3] In 2011, Congress further expanded Section 1442 by amending section 2(b) to permit removal "for ***or relating to*** any acts under color" of federal office, so as "to broaden the universe of acts that enable Federal officers to remove to Federal court." H.R. REP. 112-17, 6, 2011 U.S.C.C.A.N. 420, 425 (emphasis showing addition).

"To show causation, Defendants must only establish that the act that is the subject of Plaintiffs' attack . . . occurred ***while*** Defendants were performing their official duties." *Isaacson*, 517 F.3d at 137-38 (emphasis in original). Here, Plaintiffs' claims arise from

---

[3] The "acting under" and "under color of" prongs overlap. Both "are satisfied if the actions subject to suit resulted directly from government specifications or direction." *Albrecht*, 2011 WL 5109532, at *5.

Defendants' production and sale of CAEv2 to military specifications. Plaintiffs allege that the design of the CAEv2 is defective. Aearo developed and designed the Combat Arms™ earplugs, including establishing its length, at the direction of federal officers.

Further, even if Plaintiffs were to prove that any alleged defect was the result of an act not specifically contemplated by the government contract, "it is enough that the contracts gave rise" to the harm alleged. *See Isaacson*, 517 F.3d at 138. "[W]hether the challenged act was outside the scope of Defendants' official duties, or whether it was specifically directed by the federal Government, is one for the federal—not state—courts to answer." *Id.* (*citing Willingham*, 395 U.S. at 409.)

### D. The "Colorable Federal Defense" Requirement Is Satisfied.

The fourth requirement (establishing a "colorable federal defense") is satisfied by 3M's assertion of the government contractor defense and the combatant activities defense. Courts around the country have held that the government contractor defense and the combatant activities defense support removal under § 1442(a)(1). *See, e.g.*, *Jacks*, 701 F.3d at 1234-35 (government contractor defense supports removal under § 1442); *Isaacson*, 517 F.3d at 139 (same); *Zeringue v. Crane Co.*, 846 F.3d 785 (5th Circuit 2017) (same); *McMahon v. Presidential Airways, Inc.*, 410 F. Supp. 2d 1189, 1200 (M.D. Fla. 2006) (both government contractor defense and combatant activities defenses supported removal under Section 1442).

A defendant need not prove its defense at the removal stage; a defendant need only show that a federal defense is "colorable." *Jacks*, 701 F.3d at 1235. Courts will not "require that these defenses be clearly sustainable in order to support removal under

§ 1442(a)(1)." *Id*. (*citing Willingham*, 395 U.S. at 406–07 ("[The federal officer removal statute] is broad enough to cover all cases where federal officers can raise a colorable defense. . . . The officer need not win his case before he can have it removed.").)

At the removal stage, the inquiry "is purely jurisdictional, and neither the parties nor the district courts should be required to engage in fact-intensive motion practice, pre-discovery, to determine the threshold jurisdictional issue." *Cuomo*, 771 F.3d at 116 (citing *Kircher v. Putnam Funds Trust*, 547 U.S. 633, 644 n. 12 (2006)).[4] Moreover, "this inquiry is undertaken whilst viewing the facts in the light most favorable to Defendants." *Hagen v. Benjamin Foster Co.*, 739 F. Supp. 2d 770, 783-84 (E.D. Pa. 2010). "Precisely in those cases where a plaintiff challenges the factual sufficiency of the defendant's defense, the defendant should 'have the opportunity to present [his] version of the facts to a federal, not a state, court.'" *Cuomo*, 771 F.3d at 116 (quoting *Willingham*, 395 U.S. at 409).

### 1. 3M Has a Colorable Government Contractor Defense.

Under the government contractor defense, the defendant is not liable for alleged defects or negligence with respect to military equipment or supplies "when (1) the United States approved reasonably precise specifications; (2) the equipment conformed to those specifications; and (3) the supplier warned the United States about the dangers in the use

---

[4] *See also Kraus v. Alcatel-Lucent*, Civil Action No. 18-2119, 2018 WL 3585088, at *2 (E.D. Pa. July 25, 2018) ("A court does not 'determine credibility, weigh the quantum of evidence or discredit the source of the defense' at this stage. Instead, [the court] only determines whether there are sufficient facts alleged to raise a colorable defense.").

12

of the equipment that were known to the supplier but not to the United States." *Boyle*, 487 U.S. at 512.

3M has satisfied all of these elements for purposes of removal. As discussed above, the Defense Logistics Agency (the military's procurement agency) established reasonably precise specifications governing double-ended non-linear earplugs' performance, testing, inspection, packaging, and labeling, with which the CAEv2 complied. Plaintiffs likewise allege that the CAEv2 were subject to stringent military specifications. (Compl. ¶ 116 ("the U.S. military may only purchase earplugs that meet the testing standards established by the U.S. Army Public Health Command, Army Hearing Program, or equivalent standards that may be established by other branches of the military").) When properly used, the CAEv2 fully conform to those specifications.

Finally, the government was adequately informed regarding alleged product-related "dangers," *Boyle*, 487 U.S. at 512, to exercise its discretionary authority in specifying and procuring the CAEv2 earplugs. The U.S. military was actively involved in discussions with Aearo in the development of the CAEv2 regarding its length and instructions for use. Aearo's engineers discussed the challenges, and trade-offs, in conforming the design of the CAEv2 to fit within the military's desired carrying cases and with its other equipment.

At minimum, this constitutes colorable evidence that the U.S. military generally "made a discretionary determination" regarding the requirements and design of the CAEv2's benefits against the alleged risks. *See In re Agent Orange Prod. Liab. Litig.*, 517 F.3d 76, 90 (2d Cir. 2008); *Ayo v. 3M Co.*, No. 18-CV-0373(JS)(AYS), 2018 WL 4781145, at *14 (E.D.N.Y. Sept. 30, 2018) (holding removal proper under §1442 because defendants

presented "colorable evidence" that government was aware of alleged problems with product at issue); *see also Albrecht*, 2011 WL 5109532, at *5 ("A defendant is not required to warn the government where 'the government knew as much or more than the defendant contractor about the hazards of the product.'") (citation omitted). Where, as here, the government has exercised "discretionary authority over areas of significant federal interest such as military procurement," the government contractor defense applies. *Agent Orange*, 517 F.3d at 89-90; *see also Ayo*, 2018 WL 4781145, at *13.

### 2. 3M Has a Colorable Combatant Activities Defense.

The "combatant activities defense" is a complete defense for claims arising out of combat activities. Although Congress waived sovereign immunity for tort claims against the United States and those acting on its behalf in the Federal Tort Claims Act, it excluded "claims arising out of combatant activities of the military or armed forces, or the Coast Guard, during time of war." 28 U.S.C. § 2680(j). The combatant activities exception has been applied to contractors to create a federal defense shielding manufacturers from tort claims arising from war. *See, e.g.*, *Saleh v. Titan Corp.*, 580 F.3d 1, 6 (D.C. Cir. 2009) (applying § 2680(j) exception to tort claims arising from treatment of inmates in military prison in Iraq brought against private contractor); *Bentzlin v. Hughes Aircraft Co.*, 833 F. Supp. 1486, 1492 (C.D. Cal. 1993) ("The combatant activities exception generates a federal common law defense which immunizes manufacturers such as Hughes from state tort suits arising from war.") The combatant activities defense is broader than the government contractor defense under *Boyle* because it acts like "field preemption because it casts a[n]

14

immunity net over any claim that *arises* out of combat activities." *Saleh*, 580 F.3d at 6 (emphasis in original; internal citation omitted).

Application of the defense has two elements: (1) the presence of combatant activities; and (2) that such activities occur during a time of war. The combatant activities element has been liberally construed and is not limited to the exertion of physical force. *See Johnson v. U.S.*, 170 F.2d 767, 770 (9th Cir. 1948). Rather, "activities both necessary to and in direct connection with actual hostilities" are included. *Id.* Ammunition supply, troop movement and logistical support, and holding prisoners of war have all qualified as combatant activities under the test. *See Aiello v. Kellogg, Brown & Root Servs.*, 751 F. Supp. 2d 698, 706 (S.D.N.Y. 2011).

Each factor is satisfied here. The Complaint alleges that each Plaintiff suffered hearing loss and/or tinnitus due, at least in part, to their involvement in combat, and that the CAEv2 issued to them by the military failed to provide adequate protection. (Compl. ¶¶ 98-100 ("Plaintiffs were issued and used the [CAEv2] during their service. While wearing the [CAEv2], Plaintiffs were exposed to loud and impulse noise associated with combat, combat training and combat arms and weaponry. Plaintiffs have all been diagnosed with hearing loss and/or tinnitus by the military or the Veteran's Administration Medical.").) Claims in such circumstances fall within the scope of the combatant activities defense. *See e.g.*, *Bentzlin*, 833 F. Supp. at 1492-95 (holding that claims brought against missile manufacture for causing death of U.S. soldiers as a result of alleged product defect were barred by combatant activities defense).

Accordingly, 3M is immune from tort claims arising from Plaintiffs' harm suffered while they were engaged in combatant activities. This defense separately supports federal question jurisdiction under Section 1442 and removal to this Court.

### 3. 3M Has a Colorable Basis for Asserting that This Case Presents a Nonjusticiable Political Question.

3M also intends to argue that Plaintiffs' suit presents a nonjusticiable political question. "[M]ilitary activities often give rise to political questions." *McMahon v. Presidential Airways, Inc.*, 502 F.3d 1331, 1358 (11th Cir. 2007). Courts have recognized that "the interjection of tort law into the realms of foreign policy and military affairs would effectively permit judicial reappraisal of judgments the Constitution has committed to the other branches." *Id.* (citation and internal quotation omitted). Thus, decisions about "[t]he strategy and tactics employed on the battlefield" are beyond a federal court's ability to review. *Tiffany v. United States*, 931 F.2d 271, 277 (4th Cir. 1991).

As a general matter, cases brought by "soldiers injured at the hands of the military raise political questions." *Whitaker*, 444 F. Supp. 2d at 1281; *see also Bentzlin*, 833 F. Supp. at 1497-98, *Carmichael v. Kellogg Brown & Root Servs., Inc.*, 572 F.3d 1271 (11th Cir. 2009). Moreover, "a soldier injured at the hands of a contractor which is performing military functions subject to the military's orders and regulations also raises the same political questions." *Whitaker*, 444 F. Supp. 2d at 1281. This is such a case. Plaintiffs are servicemembers. They allege that they suffered hearing loss and/or tinnitus due to exposure to "loud and impulse noise associated with combat, combat training and combat arms and weaponry." (Compl. ¶¶ 99-100.) There is no doubt that the U.S. military made the decision

16

to issue the CAEv2 to Plaintiffs, that the U.S. military directed Plaintiffs during training exercises, and that the U.S. military directed their activities in combat.[5] *See Whitaker*, 444 F. Supp. 2d at 1279 (concluding that suit against Army contractor for negligent operation of a convoy vehicle presented a political question where the Army regulated "all aspects of control, organization, and planning of Army convoy operations").

As discussed above, the design of the CAEv2 reflects the balance struck by the military between hearing protection and military operational needs. The decision to issue the CAEv2 to servicemembers, and the instructions to Plaintiffs and others, about when and where to use them, was made by the U.S. military. Accordingly, resolution of Plaintiffs' claims for design defect and inadequate warnings requires inquiry into the military's decisions and conduct. *See Gilligan v. Morgan*, 413 U.S. 1, 10 (1973) ("The complex subtle, and professional decisions as to the composition, training, equipping and control of a military force are essentially professional military judgments, subject always to civilian control of the Legislative and Executive Branches."). Plaintiffs' claims therefore are nonjusticiable and are barred by the political question doctrine.

---

[5] This case is, therefore, unlike *Brokaw v. Boeing Co.*, 137 F. Supp. 3d 1082, 1104 (N.D. Ill. 2015), where the court rejected the application of the political question doctrine and remanded to state court because the plaintiffs were family members of civilian contractors, not service members, and the military had "only tangential involvement" in those civilians' deaths in a plane crash.

## II. REMOVAL IS ALSO PROPER BECAUSE PLAINTIFFS' CLAIMS AROSE IN PART ON FEDERAL ENCLAVES.

In addition, removal of this action is proper because Plaintiffs' claims almost certainly arose, at least in part, at a federal enclave—namely, U.S. military facilities throughout the United States. To that extent, the claims are governed by federal law and are subject to this Court's federal question jurisdiction under 28 U.S.C. § 1331. Thus, this action is removable under 28 U.S.C. § 1441(a).

"A federal enclave is a portion of land over which the United States government exercises federal legislative jurisdiction." *Brookhaven Sci. Assocs., LLC v. Donaldson*, No. 04 Civ. 4013(LAP), 2007 WL 2319141, at *5 (S.D.N.Y. Aug. 9, 2007) (internal quotation and citation omitted). The Constitution confers on Congress the power "[t]o exercise exclusive legislation" over the District of Columbia "and to exercise like authority over all places purchased by the consent of the legislature of the state in which the same shall be, for the erection of forts, magazines, arsenals, dockyards, and other needful buildings." U.S. Const. art. I, § 8, cl. 17. "It has long been settled that where lands for such a purpose are purchased by the United States with the consent of the State legislature, the jurisdiction theretofore residing in the state passes, in virtue of the constitutional provision, to the United States, thereby making the jurisdiction of the latter the sole jurisdiction." *Surplus Trading Co. v. Cook*, 281 U.S. 647, 652 (1930).

Because the United States exercises sole lawmaking authority over a federal enclave, the law applicable to that enclave is, by definition, federal law, although such federal law may incorporate state-law rules of decision. *See, e.g.*, *Mater v. Holley*, 200 F.2d

123, 124 (5th Cir. 1952) ("[A]ny law existing in territory over which the United States has 'exclusive' sovereignty must derive its authority and force from the United States and is for that reason federal law"); *accord Macomber v. Bose*, 401 F.2d 545, 546 (9th Cir. 1968) ("State law theretofore applicable within the [ceded] area was assimilated as federal law, to remain in effect until changed by Congress. Rights arising under such assimilated law, arise under federal law and are properly the subject of federal jurisdiction."); *Brookhaven Sci. Assocs.*, 2007 WL 2319141, at *5 ("[W]hen an area becomes a federal enclave, the state law in effect at the time of cession becomes federal law and is the applicable law unless Congress provides otherwise.").

Federal courts have federal-question jurisdiction under 28 U.S.C. § 1331 for actions involving tort claims that arise on federal enclaves. *See, e.g.*, *Akin v. Ashland Chem. Co.*, 156 F.3d 1030, 1034 (10th Cir. 1998) (movant properly removed case to federal court when case was removed based on movant's status as a "person acting under" a federal officer, and status of the Air Force base as a federal enclave). It follows that such actions, if originally filed in state court, may be removed to federal court under 28 U.S.C. § 1441(a). *See, e.g.*, *Allison v. Boeing Laser Tech. Servs.*, 689 F.3d 1234, 1236 (10th Cir. 2012) (affirming grant of summary judgment on state employment law claims as barred by federal enclave doctrine after removal from state court).

While Plaintiffs' Complaint does not specifically identify the U.S. military facilities where they were issued and used CAEv2 and allegedly suffered hearing damage, one or more of these facilities undoubtedly qualifies as a federal enclave. *See Jamil v. Workforce Res., LLC*, Case No.: 18-CV-27-JLS (NLS), 2018 WL 2298119, at *2 (S.D. Cal. May 21,

2018) (inferring from Complaint that some of the alleged events must have occurred at Marine Corps base, a federal enclave, and denying motion to remand). Because Plaintiffs' claims almost certainly arose, at least in part, at a federal enclave, this Court has subject matter jurisdiction over the action, and removal of the action is proper under 28 U.S.C. § 1441(a).

## **CONCLUSION**

For all the foregoing reasons, 3M hereby removes this action from the Fourth Judicial District Court of Minnesota, Hennepin County, to this Court. As noted above, co-defendant Aearo Technologies, LLC consents to this removal.

Dated: August 2, 2019

Respectfully submitted,

s/ Benjamin W. Hulse
Jerry W. Blackwell (MN #186867)
Benjamin W. Hulse (MN #0390952)
S. Jamal Faleel (MN #0320626)
BLACKWELL BURKE P.A.
431 South Seventh Street, Suite 2500
Minneapolis, MN 55415
Phone: (612) 343-3200
Fax: (612) 343-3205
Email: blackwell@blackwellburke.com
         bhulse@blackwellburke.com
         jfaleel@blackwellburke.com

**Counsel for Defendant 3M Company**